# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

MONICA A. DIXON,

         Plaintiff,

   v.                                  Case No. 09-CV-481

CITY OF RACINE,

         Defendant.

_____

## ORDER

Racine is located in southeastern Wisconsin and is the fifth largest city in the state, with a population nearing 80,000 people.[1]  Besides being known as the "Kringle Capital of the World,"[2] *A capital treat,* WISCONSIN TRAVELER, April 2006, http://www.dnr.state.wi.us/wnrmag/html/travel/2006/apr06.htm (last visited June 2, 2010), Racine, situated upon the shores of Lake Michigan at the mouth of the Root River, has an older nickname: the "Belle City of the Lakes."   George W. Peck, Jr., "OUSCONSIN." THE BADGER STATE'S COLUMBIAN SOUVENIR 18, 1893 ("The city of Racine . . . has been wisely called the "Belle City of the Lakes," since she is a belle in every sense of the word . . . her beauties in summer are wont to attract the tourist,

---

[1] The 2006 estimate of the population of Racine by the United States Census Bureau states that Racine's population is around 79,592 people.  *See* U.S. Census Bureau, *Racine (city) QuickFacts from the US Census Bureau*, http://quickfacts.census.gov/qfd/states/55/5566000.html (last visited June 2, 2010).

[2] Kringle is a large, oval shaped pastry with a flaky and buttery crust, filled with sweet fruit or nut fillings.  Introduced by Danish immigrant bakers in the late nineteenth century to southeastern Wisconsin, Racine is world famous as being the source of thousands of kringles that are shipped all over the world.  *See* Susan Troller, *Kringle Brings a Tingle at Christmas,* THE CAPITAL TIMES, December 25, 2008, at 13.

while her fame as a manufacturing city has a tendency to attract the capitalist.") The organization tasked with ensuring that Racine lives up to its latter appellation is the city's Parks and Recreation Department ("Parks Department"), which maintains Racine's eighty-six public parks, in addition to providing recreational programs and cultural services to the city. The instant case relates to the Belle City's staffing of its Parks Department. Specifically, the plaintiff, Monica Dixon ("Dixon"), claims she was eligible for and wanted to move from her position in Racine's Department of Public Works ("DPW") to work for the Parks Department. The defendant, the City of Racine ("city" or "Racine"), however, did not allow Dixon to move to the higher paid job, instead providing it to her male co-worker. The plaintiff filed suit against the city on May 11, 2009, alleging that the defendant denied Dixon the promotion because of her gender. (Docket #1). On January 22, 2010, the defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56. (Docket #23). With the benefit of the parties' briefs, the court is prepared to address the motion. The court begins by recounting the undisputed facts propelling the present dispute.

## UNDISPUTED FACTS

Ms. Dixon, an African-American female, began working for the City of Racine on July 5, 1988, as a "clerk-typist" in Racine's police department. Over the next nine years, the plaintiff served Racine in various roles, such as working in the city's purchasing department and in the city's health department. On February 17, 1997, Dixon transferred into the city's DPW, initially working as a typist. Eventually, Ms.

Case 2:09-cv-00481-JPS   Filed 06/08/10   Page 2 of 21   Document 33

Dixon became a "garage worker" in Racine's DPW. On the same day that the plaintiff transferred into the DPW, Dixon also became a member of Local 67 ("Local 67" or "the union"), the local collective bargaining unit of a public employee's union.[3] As a result, Dixon is "subject to the terms and provisions of the collective bargaining agreement" ("CBA") between the City of Racine and Local 67. (PPFF ¶ 5, DPFF ¶ 6).

The CBA between the city and the union has been updated and changed periodically through the years.[4] The January 2003 through December 31, 2005 version of the CBA ("2003-2005 CBA"), the agreement that was in effect when the immediate events animating this litigation occurred, contained a series of statements regarding an employee's rights in the case of a layoff. In relevant part, the document stated that in "all matters involving increases or decreases of forces, layoffs, or promotions, the length of continuous service with the employer shall be given primary consideration" 2003-2005 CBA, Article V, ¶ B. Specifically, the CBA mandated that any layoffs should be according to "*City-wide seniority*," *id.* at ¶ E (emphasis added), and that "employees having seniority shall be transferred to other departments where work is available," instead of being laid off, contingent on the employee's ability "to do the work required." However, in language that seems to

---

[3] Local 67 is affiliated with the American Federation of State County and Municipal Employees and the American Federation of Labor and Congress of Industrial Organizations.

[4] What these changes entail or what the content of the CBAs prior to the 2003-2005 CBA is outside the record, as the defendant failed to submit any copies of the previous CBAs, despite citing to them repeatedly in its proposed findings of fact to the court.

Case 2:09-cv-00481-JPS   Filed 06/08/10   Page 3 of 21   Document 33

contradict paragraph E of Article V of the 2003-2005 CBA, the document, in paragraph A of Article V, defines "seniority" of a regular employee by the "length of his [or her] service, completed in years, months and days from the first day of his [or her] last continuous employment *within the bargaining unit on a city-wide basis*." *Id.* at ¶ A (emphasis added).

In November of 2005, Racine employed two "garage workers" in the DPW, the plaintiff and a man named Eddie Dobbins ("Dobbins"). Mr. Dobbins began working for the city on April 2, 1991, nearly three years after Ms. Dixon began working for the defendant. Dobbins, however, started his work for the city in the DPW,[5] and, as a result, was a member of the Local 67 on the same day he began working for the city. Consequently, Dixon had "greater city-wide seniority than Dobbins, but Dobbins had greater Local 67 bargaining unit seniority than Dixon." (DPFF ¶ 18).

On November 16, 2005, "the City eliminated one Garage Worker position." (PPFF ¶ 11). Two weeks later, on November 30, 2005, the then-Interim Human Resources Director for Racine, Terry Parker ("Parker"),[6] apprised the plaintiff that the city's Common Council had voted to eliminate "a number of positions" "due to budgetary considerations." Parker further informed Dixon that "as a direct result of these eliminations" the plaintiff needed to notify the city's Human Resources

_____

[5] From May of 1991 until January of 1993, Dobbins was employed in Racine's Department of Solid Waste, before returning to the DPW. Mr. Dobbins' short tenure in the Department of Solid Waste did not extinguish his membership in the Local 67.

[6] Parker has since been made the permanent Human Resources Director for the City.

-4-

Department by December 9, 2005, as to what her intentions were "in regard to bumping based on seniority or posting for another position within the scope of the Local 67."[7] The letter further urged Ms. Dixon to contact her union representative so that he or she could explain "layoff, seniority, job posting, and recall rights" that the plaintiff potentially possessed. The letter is silent as to the justification for why Ms. Dixon's position, as opposed to Mr. Dobbins' post, was potentially being eliminated, but both parties agree that Mr. Parker interpreted the 2003-2005 CBA to favor "bargaining unit seniority," as opposed to "city-wide seniority," when determining who should be laid off, and, as a result, eliminated Ms. Dixon's position.[8] (PPFF ¶ 13; DPFF ¶ 29). As a result, it "initially . . . appeared" that, because of being laid off from the garage worker position, Ms. Dixon would have to "bump into a truck driver position" in the DPW. (PPFF ¶ 17).

---

[7] The November 30, 2005 letter is hardly the model of clarity. It is unclear from the language of the letter what the exact purpose of the letter was. The parties dispute whether the letter was formally an announcement that Ms. Dixon had been laid off. *See* Pl's Resp. to DPFF ¶ 28 ("Plaintiff disputes that the November 30 letter from Terry Parker states that Dixon's position has been eliminated.") Moreover, the letter does not define what "bumping" or "posting for another position" entails, but presumably "bumping" is a reference to the right of a capable member of Local 67 to replace another employee with less seniority and "posting for another position" is a reference to the ability of an employee in the bargaining unit to be able to apply for a job vacancy and receive preference when being considered for that position. However, the letter itself is of no help. The court takes no stance on the exact intention of the November 30, 2005 letter, but merely notes that the letter informed Dixon that she was potentially being laid off and that she should contact her "union representative for a complete explanation of her rights." (PPFF ¶ 12; DPFF ¶ 28).

[8] Mr. Parker claims his initial interpretation stemmed from the sentence in section A of the Article V of the 2003-2005 CBA, which reads: "The seniority of a regular employee is determined by the length of his service, computed in years, months and days from the first day of his continuous employment within the bargaining unit on a city-wide basis."

-5-

After receiving the news about the potential elimination of her position as a garage worker, Ms. Dixon contacted union personnel and informed them that the "CBA required city-wide seniority, rather than bargaining unit seniority to be used for purposes of job elimination." (PPFF ¶ 14). After meeting with union representatives,[9] (Sharp Dep. at 12), Mr. Parker sent a letter on December 21, 2005, to Ms. Dixon informing her that "due to a recent legal interpretation of the [2003-2005 CBA]" she was now "determined to be the most senior Equipment Washer/Greaser from the [DPW] Equipment Maintenance Garage, and thus [she was required to] continue to report to [her] regular work station."[10] On that same day, Parker also sent a letter to Eddie Dobbins, informing him that he was "the least senior" garage worker,[11] and, as a consequence, Dobbins would be bumped into the position of "truck driver" for the DPW.

---

[9] The parties dispute what exactly occurred at these meetings, but it is immaterial for the purposes of resolving the motion.

[10] Ms. Dixon was technically employed as a "garage worker." The city seems to use "garage worker" and the phrase "equipment washer/greaser" interchangeably. The plaintiff objects to the reference of Ms. Dixon as an "equipment washer/greaser," but it is entirely unclear why the difference in nomenclature matters. The plaintiff should not object to the most minute discrepancy in a proposed finding of fact: such actions are the epitome of overlitigation and only frustrates the court, as the court is only distracted from its task of determining what material facts are undisputed in the case.

[11] Dobbins was referred to as an "equipment washer/greaser" in the letter. However, Mr. Dobbins was actually a garage worker at the time of the letter according to his employment record. For the reasons stated in the previous footnote, this discrepancy matters little.

However, at some point in December of 2005,[12] union representatives presented the interim Human Resources Director with a "Memorandum of Agreement" between the city and Local 67 dated May 17, 2004. The memorandum amended an earlier agreement between the union and the city which required that "all equipment operators signing into the Parks Department" must have a "category 3 Ornamental and Turf Commercial Pesticide Certification." The May 17, 2004 Memorandum of Agreement stated that the requirement of having pesticide certification would not apply "in the event of bumping into [an] Equipment Operator [position] in the Parks Department in the event of layoffs in the bargaining unit." (DPFF ¶ 26). The union representatives used the May 17, 2004 Memorandum of Agreement to argue that Mr. Dobbins, who, like Ms. Dixon, did not have pesticide certification, should have the option to bumping into the Racine Parks Department, as a position in the Parks Department paid more than the position Dobbins (or Dixon) currently held in the DPW: whereas the garage worker position paid $20.61 per hour, the position in the Parks Department paid $21.19 per hour. As a result, Parker changed his mind again and decided to place Dobbins as an Equipment Operator in the Parks Department. It remains in dispute as to whether Mr. Dobbins wanted the position in the Parks Department.

---

[12] The parties dispute whether Parker learned of the May 17, 2004 memorandum of agreement before Mr. Dobbins was informed his job was eliminated.

Ms. Dixon, upon learning about the higher-paid position in the Parks Department,[13] requested, through her union, that she be allowed to accept the job elimination that was assigned to Dobbins and "bump" into the Parks Department. In making her request, Dixon relied on language in Article V, Section E of the 2003-2005 CBA that stated: (1) "If a more senior employee desires to accept a layoff, he [or she] may choose to take such a layoff"; and (2) "Employees having seniority shall be transferred to other departments where work is available rather than to be laid off, providing they are able to do the work required." However, Mr. Parker refused to honor Ms. Dixon's request, stating that Dixon could take a voluntary lay-off, but could not bump into the Parks Department.[14]

On the afternoon of December 29, 2005, Local 67's President Scott Sharp ("Sharp"), Eddie Dobbins, and Terry Parker met to discuss Mr. Dobbins' job elimination. What exactly occurred in the meeting remains in factual dispute. According to the plaintiff, aided by the testimony provided by Mr. Sharp, during the meeting, the topic of Ms. Dixon and the job in the Parks Department arose. According to the witness, Mr. Parker, in what Mr. Sharp described as an "attempt at humor" or "an off-colored comment," stated that the Parks Department did not "want her, [Ms. Dixon,] down there because she's a woman." (Sharp Dep. 41-42). Mr.

---

[13] It is disputed as to when Ms. Dixon learned about the position in the Parks Department, but again this fact is irrelevant to the present motion.

[14] The defendant contends that Mr. Parker made such an interpretation of the CBA because of a December 31, 1981 Memorandum of Understanding between the city and the union, which does not indicate that employees with seniority can elect to be laid off and bump into another department. The parties dispute the present applicability of the 1981 memorandum.

Case 2:09-cv-00481-JPS   Filed 06/08/10   Page 8 of 21   Document 33

Parker vehemently denies making the statement or any reference to Ms. Dixon during the meeting. (Parker Dep. 24). Regardless of what was said during the meeting, Mr. Parker maintained his position that Ms. Dixon could not transfer into the Parks Department in lieu of Mr. Dobbins.

Subsequently, Ms. Dixon requested that the union file a grievance on her behalf due to the city's refusal to allow the plaintiff to bump into the Parks Department. The union did not file an individualized grievance on Ms. Dixon's behalf, however. Instead, finding that the issues leading to Ms. Dixon's complaints affected multiple union members, the union opted to file a generalized "policy grievance" to clarify the broad issues of: (1) what constituted "seniority" under the CBA; and (2) whether the "most senior employee" could accept a layoff and exercise bumping rights. (Sharp Dep. 52). Ultimately, on October 2, 2007, representatives of the city and the union signed another memorandum of agreement that resolved the policy grievance. The October 2, 2007 agreement affirmed Ms. Dixon's assertion that "senior employees within [an] affected job classification" did indeed have the right to "choose to accept a layoff or bump any junior employees within the Local 67 . . . provided they are able to do the work required." However, the memorandum of agreement defined seniority on the "basis of employment time within the Local 67," instead of on the basis of employment with the city. As a consequence, Dixon was never bumped into the Parks Department and remains employed as a garage worker in Racine's DPW to this day. Mr. Dobbins' exact

-9-

feelings regarding being bumped into the Parks Department remain in factual dispute, and it is unclear as to whether Mr. Dobbins would have exercised his bumping rights from the beginning had Ms. Dixon's job been eliminated.

On May 11, 2009, the plaintiff filed a complaint against the City of Racine in this court, (Docket #1), alleging that the defendant violated Title VII of the Civil Rights Act of 1964 by denying "her the position of Equipment Operator [in the Racine Parks Department] based upon her gender." (Compl. ¶¶ 5-6). Following discovery, on January 22, 2010, the defendant moved for a summary judgment. (Docket #23). The court proceeds to address the merits of the defendant's motion.

## DISCUSSION

Summary judgment is appropriate where the "pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)). Once the movant satisfies this initial burden, the burden

then shifts to the non-moving party who "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting Anderson, 477 U.S. at 248). In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007). With these standards in mind, the court looks to the specific allegations made by the plaintiff.

The plaintiff alleges in her complaint that the defendant has violated Title VII of the Civil Rights Act of 1964, which provides, in relevant part, that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A complaining party can demonstrate actionable discrimination by proceeding under either the direct or indirect method of proof. *See Atanus v. Perry,* 520 F.3d 662, 672 (7th Cir. 2008).

A plaintiff proceeding under the direct method can survive summary judgment by "creating triable issues as to whether discrimination motivated the adverse employment action of which he [or she] complains." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). Under the direct method, a plaintiff can

Case 2:09-cv-00481-JPS   Filed 06/08/10   Page 11 of 21   Document 33

first establish a discriminatory intent by relying on direct evidence.[15]  *Id.*  Direct

evidence is "evidence which, if believed by the trier of fact, will prove the particular

fact in question without reliance upon inference or presumption."  *Rudin v. Lincoln*

*Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005).  Such evidence  "usually

requires an admission from the decisionmaker about *his* discriminatory animus."

*Nagle,* 554 F.3d at 1114 (emphasis added).

Here, the plaintiff argues that this case is the "rare" one in which there is

actual direct evidence of the decisionmaker admitting his discriminatory intent.

Specifically, the plaintiff contends that the alleged statement by the decisionmaker

Terry Parker that "maybe they don't want her down there because she [is] a woman"

is direct evidence of his discriminatory intent.  While the alleged statement that Mr.

Parker made comes very close to being direct evidence of his discriminatory animus,

the court concludes that the evidence does not fall under that rubric.  The statement

that is attributed to Mr. Parker, even when viewed in a light most favorably to the

plaintiff, does not indicate that *he* prevented Ms. Dixon from being placed in the

Parks Department because she was a woman; rather it indicates, at best, that Mr.

Parker was under the impression that unnamed individuals in the Parks Department

did not want Ms. Dixon in their department because of her gender.  It is not a direct

---

[15] A common misconception hinted at in both briefs is that only "direct evidence" can suffice
to prove retaliation under the direct method.   However, circumstantial evidence is sufficient to
create the causal link under the direct method.  *See Rudin v. Lincoln Land Community College*, 420
F.3d 712, 720 n.3 (7th Cir. 2005) ("Such confusion is understandable; 'there are several cases that
arguably conflate the direct method with direct evidence' . . . [n]onetheless, 'we reemphasize here
that use of direct evidence is merely one of two means (the other being the use of circumstantial
evidence) of proceeding under the direct method.'") (internal citations omitted).

admission that Mr. Parker made his decision because of Ms. Dixon's gender; rather one has to infer that Mr. Parker was influenced by what he perceived as the Parks Department's attitudes toward women when he made his decision, taking the evidence out of the realm of "direct evidence." *See Rudin,* 420 F.3d at 720; *see also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) ("Direct evidence typically relates to the motivation of the *decisionmaker* responsible for the contested decision") (emphasis added).

However, just because the plaintiff does not have direct *evidence* of discrimination does not mean that the plaintiff will not succeed under the direct *method* of proving gender discrimination in violation of Title VII. "Rather, an employee also can provide circumstantial evidence 'which suggests discrimination albeit through a longer chain of inferences.'" *Zafar Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008) (internal citations omitted). The Seventh Circuit has identified three types of circumstantial evidence of "particular reference" when establishing the inference of intentional discrimination in Title VII cases:

> The first [and most common] consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated

-13-

reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). The "key consideration" for the court when evaluating circumstantial evidence of discrimination is to look at the "totality of these pieces of evidence, none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Walker v. Bd. of Regents of the Univ. of Wis. Sys.*, 410 F.3d 387, 394 (7th Cir. 2005) (internal citations omitted).

In what can only be called a "shotgun approach" to litigation, Dixon raises a score of issues that the plaintiff contends suffices as "circumstantial evidence" of discrimination. Because of Dixon's approach in her response brief and to the proposed findings of fact, the court had to expend considerable time separating the proverbial wheat from the chaff.[16] However, having said that, the court does find that Dixon has proffered credible circumstantial evidence that creates a "convincing mosaic" of discrimination against the plaintiff based on her gender.

---

[16] In part, the plaintiff contends that intentional discrimination occurred because the parties openly dispute: (1) the *exact date* in which Terry Parker learned that a laid off union worker did not need a pesticide license in order to bump into the Racine Parks Department; (2) whether Dixon *personally* informed anyone in the city regarding what she thought were faulty interpretations of the CBA; and (3) whether the 1981 Memorandum of Understanding was applicable to the parties' conflict. However, not all factual disputes are material in nature. The plaintiff needs to keep in mind that evidence of discrimination, whether "direct or circumstantial," must "point directly" to a discriminatory reason for the employer's action. *Atanus,* 520 F.3d at 671. The three aforementioned issues raised by the plaintiff in her brief either have nothing to do with intentional discrimination or are so extremely attenuated that the plaintiff could not proffer a cogent argument in her brief as to how they were circumstantial evidence of the city's intentional discrimination.

-14-

The most powerful piece of evidence by the plaintiff is the comment allegedly stated by Terry Parker that the Parks Department did not want Ms. Dixon "down there . . . because she [is] a woman." The statement, assuming it was actually made as this court must for the purposes of summary judgment, allows the natural inference that Mr. Parker's decision to prevent Ms. Dixon from taking the higher paying job was not solely based on his interpretation of the CBA. Rather, the comment indicates Mr. Parker may have been influenced by what he perceived to be the Parks Department's negative attitudes toward Ms. Dixon's gender when opting to not allow her to transfer to the new position – i.e., gender discrimination motivated the adverse employment action. *Nagle,* 554 F.3d at 1114. Moreover, the comment, even if made as an attempt at humor, evinces a rather hostile attitude on the behalf of Mr. Parker regarding the role of gender and employment decisions. Coupling that with the fact that the comment was allegedly made around the same exact time Mr. Parker had made his decision to transfer Eddie Dobbins to the Parks Department, provides strong circumstantial evidence, if the statement is believed to be true, that invidious discrimination was the cause of Ms. Dixon not getting the job in the Parks Department. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be contemporaneous with . . . or causally related to [the adverse employment decision.]").

-15-

The defendant raises several arguments against the use of Mr. Parker's comment as circumstantial evidence in support of the plaintiff's Title VII claim. First, the defendant argues that the alleged statement of Mr. Parker is a hearsay statement and is inadmissible under Fed. R. Evid. 802. However, hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), and Dixon does not offer the statement "they don't want her down there because she is a woman" to prove that the Parks Department objected to Ms. Dixon's placement in their department because of the plaintiff's gender. Rather, the statement is used to prove that Mr. Parker was influenced by his belief regarding the Parks Department's attitudes in making the decision to not allow Ms. Dixon to bump into the new position. Accordingly, the statement is not used in evidence to prove the truth of the proposition in question, and the statement is not hearsay.

Second, the city objects that Mr. Parker's statement was, if believed, at best an attempt "to make humor" out of the situation, which does not indicate invidious discrimination. However, as discussed above, the mere fact that Mr. Parker would make such an inappropriate joke so close in time to when he made the decision in question is demonstrative of a hostile attitude that calls into question his true motives in prohibiting Ms. Dixon from taking the new job. More fundamentally, questions related to the employer's "intent and credibility" are to be resolved by the jury and not this court. *Leffel v. Valley Fin. Servs.*, 113 F.3d 787 (7th Cir. 1997) ("As this is an

employment discrimination case, we also take care not to resolve any genuine disputes that have been properly established as to the employer's intent and credibility"); *see also Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009) ("Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless no rational factfinder could draw the contrary inference."). In short, the City of Racine can save its argument regarding Mr. Parker's intent for the jury.

Third, the defendant claims that the statement, if it was said, was a "stray remark" that the Seventh Circuit has previously found insufficient to be evidence of a discriminatory motive. However, the cases[17] cited by the defendant in support of its contention are either cases in which: (1) a remark was made by a nondecisionmaker; or (2) the remark made was innocuous or unrelated to the alleged discriminatory employment decision. In this case, however, the remark in question was made by the decisionmaker and directly relates to the alleged discriminatory employment decision, as the comment was made contemporaneously with the adverse employment action, sufficing as circumstantial evidence of discrimination. *See Dandy v. UPS*, 388 F.3d 263 (7th Cir. 2004) ("[E]pithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the

---

[17] The defendants cite to *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 723 (7th Cir. 2001), *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006), *Schaffner v. Glencoe Park Dist.,* 256 F.3d 616, 622-23 (7th Cir. 2001), and *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 611 (7th Cir. 2001).

Case 2:09-cv-00481-JPS   Filed 06/08/10   Page 17 of 21   Document 33

decision-maker, or those who influence the decision-maker, and made close in time to the adverse employment decision.")

In addition to the evidence regarding the statement made by Mr. Parker, the plaintiff credibly suggests that the defendant's proffered reason for the adverse employment decision is suspicious or unworthy of belief. The city's reason for why Ms. Dixon was not allowed to bump into the Parks Department was that she was not afforded the right under the CBA to: (1) accept a lay off in the place of the junior employee; and (2) acquire the opportunity to bump that was formerly afforded to the junior employee. However, the 2003-2005 CBA's language is clear: "[i]f a more senior employee desire[d] to accept a layoff, he" or she had the right to "choose to take such a layoff" and could "be transferred to other departments where work is available rather than to be laid off, providing they are able to do the work required." The 1981 Memorandum of Understanding that was relied upon by Mr. Parker to conclude that Ms. Dixon did not have the right to accept a layoff and bump does not come close to indicating as such.[18] Moreover, the city's treatment of Ms. Dixon relative to Mr. Dobbins is suspicious: when viewed in a light most favorably to the

---

[18] The 1981 Memorandum of Understanding on its face appears to only relate to resolving a dispute that occurred in December of 1981 and does not appear to have any precedential effect. Moreover, the 1981 Memorandum of Understanding does not prohibit a senior employee from opting to accept a layoff and exercise bumping rights; the document is silent on the question. The only document that is not silent on the issue is the 2003-2005 CBA, and it is remarkable that Mr. Parker did not rely on the plain language of the CBA in making his decision about whether Ms. Dixon could bump into the Parks Department. In short, Mr. Parker's decision to rely on the 1981 Memorandum of Understanding does not withstand even the slightest scrutiny, and, accordingly, the court finds that when viewed in the context of Mr. Parker's statement, it could have been a pretext for a discriminatory employment decision.

-18-

plaintiff, the evidence indicates that Mr. Parker continually interpreted the vague and contradictory language in the 2003-2005 CBA to favor Mr. Dobbins.  Ultimately, Mr. Parker's decision regarding Ms. Dixon's rights to move into the Parks Department position is puzzling and suspicious.  Given that the city's explanation for why the adverse employment decision was made can be viewed as "unworthy of belief," *Troupe,* 20 F.3d at 736, that fact, together with the statement allegedly made by Mr. Parker, creates a "convincing mosaic" of circumstantial evidence that would allow a jury to find that discrimination influenced the adverse employment decision.[19]  *Id.*

The defendant argues that Terry Parker was merely applying the terms of the CBA and, more broadly, the city was merely carrying out the dictates of a bona fide seniority system when Ms. Dixon was prevented from transferring into the Parks Department.[20]  However, as the defendant repeatedly argues in its briefs, the language in the 2003-2005 CBA with respect to seniority was "vague," (Def.'s Reply. Br. 5), and even contradictory.  Indeed, the city was unclear of what obligations it had until it formed an entirely new agreement with the union on October 2, 2007, to

---

[19] The defendant argues that "even if Terry Parker unintentionally or inaccurately misapplied the CBA as to Monica Dixon, this alone will not establish liability."  (Def's Br. 12).  The court agrees with the defendant's general statement.  However, in this case, the plaintiff has presented evidence that indicates that Terry Parker may have intentionally interpreted the CBA in a way that discriminated against Ms. Dixon, which would constitute a violation of Title VII.

[20] Presumably, although not obvious from the city's briefs to the court, the defendant may also be arguing that it was inevitable that Ms. Dixon would not be able to acquire the job in the Parks Department, as she was ultimately determined to be the most junior employee, giving Mr. Dobbins the choice to accept the higher paid position.  However, it is in factual dispute whether Mr. Dobbins would have even elected to bump into the Parks Department job, making it more than possible that Ms. Dixon was denied the opportunity at the higher paid job.  Moreover, at the very least, Ms. Dixon's seniority status was not determined until a year after  she was denied the Parks Department job, denying her the benefits of the higher paid job for that time period.

-19-

resolve the misunderstandings that surrounded the decision to not allow Ms. Dixon to take the Parks Department job. Given that the language in the CBA was vague and contradicted itself with respect to its terms on seniority, it is preposterous for the city to now argue that it was compelled to follow the obligations imposed by the CBA when it decided to take the adverse employment action against Ms. Dixon. Thus, this case is distinguishable from the cases cited by the defendant in its briefs, such as *Rose v. Bridgeport Brass Co.*, 487 F.2d 804 (7th Cir. 1973) and *Marshall v. Western Grain Co.*, 838 F.2d 1165 (11th Cir. 1988), cases in which the unambiguous language of a non-discriminatory collective bargaining agreement *required* the defendant company to act in an adverse manner to the plaintiff.[21] In this case, the plaintiff has presented enough evidence that indicates that Mr. Parker was motivated by Ms. Dixon's gender and not by the language in the CBA or some principle of contract interpretation in making the adverse employment decision, allowing the plaintiff to survive summary judgment.

Because summary judgment for the City of Racine is precluded by the evidence that Ms. Dixon has presented under the direct method of proof, there is no need to address the parties' arguments under the *McDonnell Douglas* burden-shifting analysis. *Lang v. Illinois Dep't. of Children & Family Servs.,* 361 F.3d 416,

---

[21]In fact, there is no reason in this case to think that the 2003-2005 CBA had any relevant meaning or was even enforceable with respect to its terms on seniority. *See, e.g., Badger Mut. Ins. Co. v. Schmitz*, 647 N.W.2d 223, 2002 WI 98, ¶ 72 (2002) (holding that when a contract contains "plainly contradictory" language, the contract is unenforceable with respect to the contradictory clauses); *see also Commercial Union Midwest Ins. Co. v. Vorbeck*, 674 N.W.2d 665, 2004 WI App 11, ¶ 11 (Ct. App. 2003).

-20-

421 (7th Cir. 2004). Moreover, because Ms. Dixon's evidence of discrimination provided under the direct method is sufficient to reach a jury, she "does not bear the burden of proving that the defendant's reasons for terminating her were pretextual," as "such a burden only attaches under the indirect method of proof." *Darchak*, 580 F.3d at 633. As a result, the court will deny the defendant's motion for summary judgment.

Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment (Docket #23) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 8th day of June, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-21-